I think we're ready whenever you are, sir. Good morning. May it please the court. You make a lot of arguments about the 2016 solicitation. Correct. Is it in any way incorporated into the 2018 solicitation? I believe what we are incorporating to any degree is what we or what Eskridge was told in the debriefing. And in the debriefing they were told that... Is there anything in the record that shows... that was my next... if you say yes, I want a record site. The record site is to the debriefing. And the debriefing is... I always used to find tabs help. Yes, I know. The debriefing may actually not be in the record. Oh, there you go. The debriefing. This was the... Give us a site, please. The debriefing... Appendix, please. It's 830. Appendix 830. Okay. This is not the... this is a debriefing, but this is not the specific debriefing that the contracting officer specifically told the... Well, well, well, well. If it's not in the record, it's not in the record. Unless you have another one in there. It's not in the... Not in the appendix, no. So it is not in the record. Mr. Turner, let me ask you, what is the present status of the contract that arose from the 2018 solicitation? It is my understanding that it is being performed at least in a possibly bridge contract form by the awardee. So the contract is being performed? Correct. Now, what would you have us do, leaving aside whether the case supports a ruling in your favor? What are you looking for here at the end of the day? You want the Army to be required to terminate that contract and do what? Well, unfortunately, the time is extending into the contract period, which I believe goes until 2023. But it is my understanding that Eskridge would like to have that contract. But that would mean the Army would have to terminate the contract. Is it ansible? Am I pronouncing it correctly? Ansible. Ansible. We have to terminate that contract, right? Correct. If it's on a blanket contract, which I'm not sure that it is, that process is a bit easier than if it is actually in an option year. Because when protests occur, they will award the prospective awardee or the incumbent. If an incumbent is performing, they will award a blanket, which is temporary, and they will stretch it out for certain periods of time and waiting for the protest to conclude. I do not know if that is the case with Ansible. We can find out from the government. Well, let me ask you one other thing. I gather your main contention here, as I sense it is, that the four people who were in front of your client in the final cut, you're saying that their dollar figures didn't meet the requirements because they didn't take into account price escalation that was required in the option years. Is that correct? Well, their wage rate is correct. Price escalation that was within line with the independent government cost estimate. Now, where is the requirement, in your view, that there had to be this price escalation to take into account option years? In terms of the contract or any of the provisions of the FAR that were incorporated by reference into the contract. To what do you point and say, ah, there's the thing that says they had to take into account escalation in the option years? Let me throw in to that question. Doesn't the 2018 solicitation specify the minimum wage rate? There are two questions there. First, the 5222246, FAR 5222246, informed the contractors that a compensation realism would be done on their professional wage rates. And in that, it tells them that their rates need to be adequate for retention and recruitment. And then if you turn to appendix 172, and you look at volume number four, price, the government, while not explicitly stating that there would be a price escalation, it is telling the contractor in section D, given that 52- I'm sorry, let me find, what, are you at appendix 172? And section D, FAR 522187, basically is that the government reserves the right to exercise option years, so it is telling the contractor that they will be evaluating the option years of the contract. When you're doing a compensation realism requirement, that is telling the contractor, at least in Eskridge's thinking, and based on the fact that they were told previously that their wage rates were too low in the option years, that they needed to escalate their rates. So you're basically saying a natural reading here, a reading of this provision would lead anyone to infer from the terms of this provision, and I guess 52-222-46, that there had to be some kind of an escalation in the option years. That's basically what you're saying. Eskridge is correct, would agree with that. Now one other question that I had, and this came up, I think Judge Wallach asked you at the start of your argument, there's been discussion in the briefing and in the Leto opinion about the 2016 solicitation. We all know the history of that. What use are you saying we should make of the 2016 solicitation in our determination of this case? In other words, what role do you say the 2016 solicitation and everything that happened there plays, or should play, in connection with our determination of this case? Government contracting for small businesses, especially set-asides, this is an SDVOSB set-aside, is a pretty fierce competition. And Eskridge was specifically told that their wage rates for the option years were not in line with the IGE. In the 2016 solicitation? In the 2016. You can't point to that. It's unfortunately correct. It is not in the... I understand in the appendix. Is it in the record? It is in the record in the briefing. No, no, not the briefing, but it's not in the record. It is in the AR, which is at Coffsie, and it did not make it into the appendix. So it is in the record? It's in the administrative record at Coffsie. It's not in the appendix before this court. And I'm entirely not sure why it is not in there. Okay, well, why don't we hear from the government? So... I'm sorry. No, you've got time if you want to use it. Well, I just wanted to explain the wage rate disparity that you mentioned. I mean, this is purely theoretical on our part, but all service contracts with the government require a wage rate, specifically from the Department of Labor or, in this case, from the Department of Defense. And they release that... Yes, correct. It was $113,000, and then they bumped it up to $123,000. Let me ask you, though. Getting back to this point you raised about the 2016 solicitation and your follow-up discussion with Judge Wallach, assuming what you say is correct, you're basically saying this was a provision in the contract. The 2016 solicitation transactions, so to speak, frame this contract, but yet you have to have provisions in the contract, and there's nothing in the contract that sort of gives you what you want, I think. You're talking about the background of the 2016 solicitation, and everything you say may be true, but I don't think it helps you because what you're asking for doesn't seem to be in the contract. What we're asking for and what we expect? Well, escalation clause and what you were just talking about. But then that also goes to the relationship between the contractors and contracting officers and being confident to rely on what you're told in a debriefing. So you're saying you were told things in the 2016 solicitation debriefing, and it's your understanding that those things, and I'm not using that pejoratively, but those things would form a part of the 2018 solicitation. Is that what you're saying? Well, they wouldn't necessarily form a part of the solicitation per se, but it would form a part of how the contractor understands how the source selection authority was going to evaluate the contract or evaluate the solicitation. But maybe I misunderstood. I'm not here to help you out or make your case for you, but I thought in addition to just relying on what happened in 2016, you were also relying on the SPAR provision that I think you cited this morning, which would govern this contract as well, that deals with considering the impact on recruitment and retention. But as Judge Saul specifically said, it doesn't specifically say that there is an escalation clause in there. What we're saying is that clause is meant to tell the contractor that they need to take care of the back end of their contract when they're pricing it. Okay. Well, I don't hear from the government. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. Just to start off with a point of clarification, Eskridge's previous debriefing is in the joint appendix at page 445. And you agree with your friend's characterization of that? Well, Your Honor, the debriefing from 2017 in response to the 2016 solicitation is simply wholly irrelevant to this case. In response to a protest filed by Eskridge at the GAO, the Army canceled the solicitation and changed several substantive provisions before it issued the 2018 solicitation, including changing the number of FTEs required by the contract, changing the procurement type from best value to lowest price technically acceptable. It removed the price realism requirement and instead added a minimum wage rate. And as the trial court found at appendix page 4, the minimum wage rate was added as intended to be a price realism regulator. So the current 2018- But that doesn't deal with the out years, right? I mean, weren't we talking about what increased in subsequent years,  Well, that is correct, Your Honor. The price realism would have evaluated whether the prices were too low, which is what Eskridge has found. Their prices were found to be too low in the 2016 solicitation. So the Army, in response to the protest, removed the price realism requirement and instead added the minimum wage rate. But the minimum wage rate doesn't go to anything beyond the starting salary. That is correct, Your Honor. The minimum wage rate does not specifically address the option years. Can I just- I just have some preliminary questions. I haven't been on that many of these contract cases, and so it's just my own edification. This is only about standing. It's jurisdictional. It's only about standing, right? That is correct, Your Honor. I'm a little confused between what we look for then with what is necessary to establish standing. The Court of Federal Claims, I think, correctly says, according to the government, because four other technically acceptable proposals were lower than that of Eskridge, and Eskridge's allegations would not undermine those lower bids, the Army presumably would award the contract to someone else. We're not looking at the merits of his allegations in the standing phase, right? I mean, my classic standing case is some guy who's had two employees who's never done any contracting work challenges a contract, and it's true that the government may have done some stuff wrong with the contract, but there's no chance of him ever having gotten the contract anyway. That's the standing inquiry, that it doesn't go to the merits of his allegations. It really goes- and so let me just make my argument to you, and then you can respond. So it seems to me, is there not an argument here? You can lump all those four other contractors that did the bids that are above him and say, yeah, they didn't in the out years increase the salaries, whether he may be absolutely wrong on the merits of his allegations that that was necessary under FAR. But why is that not a merits determination? Why does that go to standing? Well, Your Honor, I would like to address the merits point, but just to address the standing point first. Under this court's case law, in the bid context, in order to have standing, offerors need to show that they have a direct economic interest, and that direct economic interest has been defined in Infotech and other cases as having a substantial chance to win the award. And because in a lowest price, technically acceptable procurement, price is the determinative factor among all of the technically acceptable offerors. An offeror must, in a technically acceptable procurement at least, must need to show that there would have been next in line in the procurement, because if the lowest price offeror is challenged, it's assumed that the award would go to the next in line. Well, let's assume my challenge is that you had to have the ability through a license in the state of Mississippi, and that was a requirement. So there could have been 10 people who had a cheaper bid than me, but if none of them had licenses, and I have a challenge that argues that they shouldn't have gotten, why does it matter whether they're four with lower prices or whatever, if his challenge, if he were successful on the merits of his allegations, that would knock out one, it would knock out four, it would knock out 40, right? Well, Your Honor, the Eskridge as the fifth in line needs to show that all four of the lower price offerors... Didn't he make the same, I mean, his allegations, if they were correct, and I don't have any view of that, would apply to all four equally. He's the only one that in subsequent years was offering an increase in the wages, and none of them did that. So why can't they be put in a bucket? And if he were to win, which he likely will not, but if he were to win, all of those guys would come out. Well, actually, Your Honor, that's just factually not accurate, that the other offerors didn't, in fact, increase in the option years. And, in fact, the agency not only noted that the offers increased, but evaluated the compensation realism to include whether the offerors escalated in the option years. And I can give you some examples from the record. Two offerors, Offeror 2 and Offeror 5, were found to be technically unacceptable. Where are you in the record? Appendix page 783. 783? Yes, Your Honor. And Appendix page 793 is a similar statement, where two offerors were found to be technically unacceptable for failing to meet the minimum wage rate. And then quoting from the source selection decision at Appendix page 847, an additional offeror, Offeror 15, was found technically unacceptable, even though it met the minimum wage rate, for failing to escalate through the option years. So you're saying this suggests that these other people, the four who were above Eskridge at the final cut, that this supports the proposition that there was an analysis with respect to option years for them? Yes, Your Honor. The agency did, in fact. Where is that? Well, Your Honor, at page 847, in the technical evaluation of Offeror 15, the agency found the offer to be unacceptable. Oh, I understand. I understand that. Where did they say about the four that were acceptable? Oh, yes, Your Honor. At Appendix page 849, this is the technical evaluation of the awardee, in subfactor four compensation plan, the agency notes that the awardee included a 2% escalation. And at page 850, another technically acceptable offeror was found to have a 2.4% escalation rate throughout the option years. So the agency did, in fact, evaluate the option years of the contract, as well as the base year. One question. Sort of the housekeeping question I asked. What is the present status of this contract? It's in full performance mode by Ansible? Yes, Your Honor. The awardee, Ansible, is currently performing and is actually into one of the option years of the contract. So we're not in a bridge contract situation? No. It was the original six-month term? I believe the original base year was a one-year term. So it was the original one-year term, and now they're into the option year? Yes, Your Honor. Okay. And to go back to Judge Prost's question about whether we're simply looking at the allegations versus looking at the merits, Eskridge here has failed in its briefing before this court, especially to challenge any aspect of the agency's actual evaluation. They don't cite in the record to any specific problem with the agency's evaluation. So it's more than that we're looking into the merits of the case. It's looking to the fact that Eskridge has failed to articulate any procurement error, specifically as to the agency's evaluation of these compensation rates. Again, the core of their argument appears to be in reference to the 2017 debriefing and the allegation that that should somehow have changed or informed the agency's evaluation of the current solicitation, which is under Guardian Moving and Storage, all procurements stand alone and the agency's not bound by any decisions it makes in a previous procurement. And to the extent Eskridge is alleging that there should have been a specific wage escalation rate in the option years, that's an argument that would be waived under blue and gold because we're in a post-award context and blue and gold requires that those types of solicitation challenges be brought pre-award. So unless your honors have any further questions for me, we would ask the court to affirm the trial court's decision finding a lack of standing. Can I just ask you one quick question? I think I read at page 25, you talking about the IGE estimate. You say it's only used to determine whether the proposed compensation is too high. I'm not sure you had any citation for that. The authority for that statement. Do you know what I'm talking about? In the evaluation at page 860, I believe, actually starting at page 859, subsection 8 is the price summary and 8D specifically talks about fair and reasonable pricing. Then the following two pages contains the agency's evaluation of whether the prices were fair and reasonable or whether they were too high. This is the only point during the source selection decision which the agency discusses the IGE rates and how far off the offers were from the rates in the IGE. Thank you, Your Honor. And as I said, I love seeing counsel stand up and say, no, it's here in the record. You can thank your friend. I was getting ready to thank her. Thank you, counsel, for pointing me to that section in the appendix. Tabs. A couple of things. First, going back to appendix 859 where the government talked about fair and reasonable pricing and that's how the compensation realism would be measured. First of all, a contractor has no knowledge of the source selection authority. And second of all, the same section of the price summary points to a price analysis under 15404 which determines if they cannot come to an understanding of price realism unless they have to do a price realism. Whether that was done or not, I cannot speak to that. But the contractor's understanding would be compensation realism under 522246 and that would be that your prices are too low. And the government is correct that there was an escalation done in each year. But our argument or Eskridge's argument was that the incremental increases were not high enough to sustain the later option years. As they were told, measuring their own percentages in the debriefing from 2016. Thank you. We thank both sides. The case is submitted. That concludes our proceeding for this morning. All rise. The honorable court is adjourned until tomorrow morning at 10 a.m.